In re Shirley A. BRUNSON a/k/a Shirley
A. Champion, Debtor.

Shirley A. BRUNSON, Plaintiff,

v.

WENDOVER FUNDING, INC. and
National Fuel Gas Distribution,
Inc., Defendants.

Bankruptcy No. 96–10367 K.
Adv. No. 96–1084 K.

United States Bankruptcy Court,
W.D. New York.

Sept. 25, 1996.

Peter D. Grubea, Aaron, Dautch, Sternberg & Lawson, Buffalo, New York, for Plaintiff/Debtor.

Anne E. Miller, Shapiro & Kreisman, Rochester, New York, for Wendover Funding, Inc.

Christopher M. Marks, Phillips, Lytle, Hitchcock, Blaine & Huber, Buffalo, New York, for National Fuel Gas Distribution, Inc.

MICHAEL J. KAPLAN, Chief Judge.

This Court today rejects substantial authority to the effect that strip-down of a residential mortgage is always permitted, as a matter of law, as to multi-family dwellings in a Chapter 13 case. This Court believes that the antimodification provision, 11 U.S.C. § 1322(b)(2), may apply in some such instances, depending on the facts of a particular case.

This is an adversary proceeding in a Chapter 13 case in which the Debtor, Shirley A. Brunson, wishes to establish that she may "strip down" the first mortgage on her residence from approximately $40,000 to the $25,000 alleged fair market value of her residence, and may strip down the second mortgage thereon from approximately $1,350 to $0. She seeks to do so despite 11 U.S.C. § 1322(b)(2) and despite the decision of the United States Supreme Court in the case of *Nobelman v. American Savings Bank*, 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993).

She believes that she may do so because her residence is a two-family dwelling; the

lenders were aware of that fact at the time the loans were made; she has generated rental income from the second unit from time to time; she currently operates a day care center for profit from that unit; and as to one of the lenders, the mortgage instrument grants the lender a security interest on any rents generated from the property.

She relies principally on the persuasive authority of *Lomas Mortgage, Inc. v. Louis,* 82 F.3d 1 (1st Cir.1996) and the authorities cited therein.

The defendants, Wendover Funding, Inc. and National Fuel Gas Distribution, Inc. have moved to dismiss, arguing that strip-down is not permitted on a residential home mortgage under 11 U.S.C. § 1322(b)(2) and *Nobelman.* The Debtor has cross-moved for judgment on the pleadings.

In the *Lomas* case (which involved a three-family dwelling), the First Circuit ruled "that the antimodification provision of § 1322(b)(2) does not bar modification of a secured claim on a multi-unit property in which one of the units is the debtor's principal residence and the security interest extends to the other income-producing units." *Lomas,* 82 F.3d at 1–2. That Court bemoaned a lack of "clear guidance" on the question from either the language or contemporaneous legislative history of § 1322(b)(2), and it resorted to "a species of subsequent, not contemporaneous, legislative history" in order to reach its decision. It ended its decision with the refrain: "If we are wrong as to what Congress intended, legislation can provide a correction." *Lomas,* 82 F.3d at 7.

This Court shares the frustration of numerous other courts in attempting to interpret this statute which is impenetrable when sought to be applied to a single parcel of land upon which the Debtor resides but which contains two or three dwelling units. As the *Lomas* court said, "... [E]xtending the anti-modification provision to multi-family housing would ... create a difficult line-drawing problem. It is unlikely Congress intended the antimodification provision to reach a 100–unit apartment complex simply because the debtor lives in one of the units." *Lomas,* 82 F.3d at 6.

This Court believes that the fact that a difficult line-drawing problem is created does not justify the *Lomas* court's conclusion that the antimodification provision should be limited only to single-family dwellings. This Court does not retreat from difficult problems. In sum, this Court agrees with everything that the *Lomas* court said except for its interpretation (discussed hereinafter) of the case of *In re Ramirez,* 62 B.R. 668 (Bankr. S.D.Cal.1986). Thus, this Court agrees with the *Lomas* court that "[the] 'plain meaning' approach to § 1322(b)(2) appears ... to be, in the end, inconclusive," *Lomas,* 82 F.3d at 4, and that the numerous cases that have attempted to resolve the present issue by reference to a "plain meaning" approach are not persuasive. (See for example *In re Adebanjo,* 165 B.R. 98 (Bankr.D.Conn.1994) and the numerous cases cited therein.)

Further, this Court agrees that the legislative history is silent on the scope of the incentive that Congress wished to give home lenders, and that the contemporaneous legislative history regarding § 1322(b)(2) provides no clear guidance.

Finally, this Court agrees with the *Lomas* court that reference to the Bankruptcy Reform Act of 1994 and its legislative history is compelling; useful comment was indeed offered when Congress added the identical antimodification language to other chapters of the Code—Chapters 11 and 12.

The *Lomas* court took the legislative history upon which it relied from a Committee Report. The present Court has found legislative history of identical substance in a different source, and here quotes the floor statements of Congressman Brooks on October 4, 1994:

This amendment conforms the treatment of residential mortgages in chapter 11 to that in chapter 13, preventing the modification of the right of a holder of a claim secured only by a security interest in the debtor's principal residence. Since it is intended to apply only to home mortgages, it applies only when the debtor is an individual. It does not apply to a commercial property, or to any transaction in which the creditor acquired a lien on property other than real property used as the debt-

or's residence. *See In re Hammond,* 276 F.3d 52 [sic. The cite should be 27 F.3d 52] (3d Cir.1994); *In re Ramirez,* 62 B.R. 668 (Bankr.S.D.Cal.1986).

140 Cong.R. H 10,764 (daily ed. Oct. 4, 1994):

While the present Court agrees that this favorable citation of the *Ramirez* case is instructive as to how Congress thought that the antimodification provision properly applies, this Court respectfully disagrees with the *Lomas* court's statement that *Ramirez* "squarely holds that the antimodification provision of § 1322(b)(2) does not apply to multi-unit houses where the security interest extends to the rental units." *Lomas,* 82 F.3d at 7.

Rather, the present Court believes that the *Ramirez* case correctly examined the totality of circumstances surrounding the land and the mortgage transaction in concluding the debtor could, in that case, strip down the mortgage loan. This Court interprets *Ramirez,* and the legislative history of the 1994 legislation, as requiring a case-by-case approach, and as requiring that the Court perform the difficult line-drawing that the First Circuit sought to avoid in *Lomas.*

The Bankruptcy Court in *Ramirez* did not make any categorical statement regarding multi-family units. Rather, it looked at the actual use of the property, the fact that the lender considered the debtor's rental income when making the loans; and the percent of the debtor's total income that was derived from the rental of the other two units in that debtor's three-family dwelling (46% of that debtor's total net monthly income of $1300).

■ In the present Court's view, each case must turn upon the intention of the parties: Was home-ownership the predominant intention (and rental income simply a means to that end) or was investment income or the operation of a business the predominant purpose of the transaction?

Some courts glibly caution lenders that if they want to avoid potential strip down, then they should not take the lien on the portion of the property that is not the debtor's principal residence. How do you do that on a single parcel that consists of a first floor flat and a second floor flat? How do you foreclose on half of a house (whether it be side-by-side units or over-and-under units)? How do you foreclose on everything but the so-called "in-law apartment"? Congress could not have intended that the home lending industry perform the impossible in order to obtain the protection of 11 U.S.C. § 1322(b)(2), nor could Congress have intended to *per se* deny that protection in the case of every residence that has rental income potential or business income potential, where the mortgage contains a boilerplate lien on such incidents of ownership as rental income. (Often a homeowner is transferred for a period of a year or two and rents out the house. By no means, in this Court's view, should a boilerplate lien on such rents permit stripdown.)

■ The types of factors that the Court should consider are: whether the Debtor (to the lender's knowledge) owned other income producing properties or other properties in which she could choose to reside; whether she had a principal occupation other than as landlord, and the extent to which rental income or other business income produced from the real estate contributed to her income; whether her total income was particularly high or particularly low; whether the mortgage was handled through the commercial loan department or the residential mortgage loan department of the lender; whether the interest rates applied to the mortgage were home loan rates or commercial loan rates; the demographics of the market (e.g. are "doubles" a much more affordable "starter home" than a single, in that locale); and the extent to which, and purpose for which, potential business uses of the land (such as farming) were considered by the lender.[1] There surely may be others.

---

1. The Court recognizes that a lender may forego a lien on rental income derived from the second unit, without prejudice to its lien on the second unit itself. That fact and the circumstances surrounding it are among the factors to be considered. Here the junior lender did not take a lien on the rents, but clearly recognized that the dwelling was a two-family dwelling. The Debtor has not agreed that foregoing the lien on rents precludes stripdown and instead argues that taking the lien on the "mixed-use property" itself permits stripdown where the property clearly has

By considering the totality of such factors, the Court may conclude whether in fact the property is "commercial" property (as would clearly be the case where larger numbers of dwelling units are concerned, or as might sometimes be the case even when there are only two dwelling units but one is on an adjacent, separate parcel of land), or whether it is (in the language of the legislative history quoted above) "real property used as the debtor's residence." The Court must focus on the predominant character of the transaction, and what the lender bargained to be within the scope of its lien. If the transaction was predominantly viewed by the parties as a loan transaction to provide the borrower with a residence, then the antimodification provision will apply. If, on the other hand, the transaction was viewed by the parties as predominantly a commercial loan transaction, then stripdown will be available. Such ruling serves the Congressional intent of encouraging home mortgage lending, as illuminated by the Supreme Court in *Nobelman.*

The motions to dismiss and the cross-motions for judgment must be denied pending an evidentiary hearing consistent with this decision. This case is set on the Motion Calendar on October 2, 1996, at 10:00 a.m. for further scheduling.

"income-producing potential." The Debtor seems to recognize, however, that her argument is weaker where no lien is taken on the rental income.